# Mason *v.* Smith, Appellant.

*Equity—Equity pleading—Responsive answer—Evidence.*

In equity a responsive answer is conclusive in favor of the defendant unless it is overcome by the testimony of two credible witnesses, or of one witness and such corroborating facts and circumstances as are equal to the testimony of another witness.

A bill in equity for an accounting of an alleged partnership in the purchase of the stock of a corporation, cannot be sustained where the answer is responsive to the bill, and the only evidence as to partnership was the plaintiff's own testimony which was squarely contradicted by that of the defendant, and an analysis of plaintiff's testimony shows that in reality there was no partnership agreement, but at the most there was given to the plaintiff an option to join in the venture of which he did not avail himself, or there was a mutual understanding that he should be liberally rewarded if the enterprise was successful.

Argued May 13, 1901. Appeal, No. 52, Oct. T., 1901, by defendant, from decree of C. P. Beaver Co., Sept. T., 1900, No. 9, on bill in equity in case of Albert G. Mason v. Charles A. Smith. Before McCOLLUM, C. J., MITCHELL, DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ. Reversed.

Bill in equity for an account.

The facts appear by the opinion of the Supreme Court.

*Error assigned* was decree appointing a receiver, and for an accounting.

*P. C. Knox*, of *Knox & Reed*, with him *J. F. Reed* and *N. B. Billingsley*, for appellant—In equity, the answer of the defendant if responsive to the bill is conclusive, unless overcome by the testimony of two credible witnesses, or the testimony of one witness and such corroborative facts or circumstances as are equal to the testimony of a witness: Rowley's Appeal, 115 Pa. 150 ; Beach's Modern Equity Practice, section 385.

*William A. McConnel* and *Robert W. Taylor*, with him *John M. Buchanan*, for appellee.—The findings of the lower court were conclusive: Steinmeyer v. Siebert, 190 Pa. 471; Stocker v. Hutter, 134 Pa. 19 ; Brotherton Bros. v. Reynolds, 164 Pa. 134; Com. v. Stevens, 178 Pa. 543; Hancock v. Melloy, 187 Pa. 371.

OPINION BY MR. JUSTICE FELL, July 17, 1901 :

It is averred in the bill filed that in February, 1896, the plaintiff and defendant, being then the owners of a part of the stock of the Ohio Valley Gas Company, entered into a parol agreement to purchase the remainder of the stock and to divide equally the profits which should arise from the management of the company or the sale of its stock; that in pursuance of this agreement they united their credit, efforts and influence, purchased the stock, and managed the company until October, 1899, when they sold the same at a net profit of $255,000 ; that with a part of the profits of this sale they purchased a large tract of land in West Virginia, built a pottery, paid the subscriptions on the stock of a corporation which they formed, known as the Taylor, Lee & Smith Company, and purchased the stock and property of the Knowles, Taylor & Anderson Company, an Ohio corporation engaged in manufacturing sewer pipe, which stock they afterwards sold for $175,000 ; that all of these purchases and sales were made in the defendant's name, and that he holds the title to all of the joint property unsold except the stock of the Taylor, Lee, & Smith Company ; that the defendant is investing the joint property and assets in other enterprises without the consent of the plaintiff and refuses to

give him a statement of their mutual accounts; and that the share of the profits of these enterprises to which the plaintiff is entitled amounts to $175,000 or $200,000. The prayers of the bill are for a receiver, an accounting, and general relief.

The answer contains a distinct and complete denial of all the averments of partnership, joint purchase or interest, and avers that all the stocks, lands, etc., referred to in the bill were bought by the defendant with his own funds or upon his own credit, and for his own account; that there was never any agreement, arrangement, or understanding of any nature or kind with the plaintiff that he was to receive any compensation for his services in connection with these transactions, or any profits arising therefrom; that the only services he rendered were in matters of detail after the negotiations were completed, and that these were rendered voluntarily by him in the expectation that his position as an officer of some of the companies connected with the property would be assured if they became vested in the defendant. The answer is fully responsive, the denial of every material allegation being specific and absolute.

In equity a responsive answer is conclusive in favor of the defendant unless it is overcome by the testimony of two credible witnesses, or of one witness and such corroborating facts and circumstances as are equal to the testimony of another witness. The plaintiff was the only witness who testified to the making of an agreement by which he acquired any interest in the properties purchased, and all of his testimony in relation thereto was denied by the defendant. In order therefore to entitle him to a decree for an account it was necessary, first that his testimony should clearly show that a partnership agreement had been made as alleged in the bill, and secondly, that his testimony should be corroborated by facts or circumstances established by indisputable evidence. The appellant's contention is that as to both of these essentials there was an entire failure.

The turning point of the case was the relation of the parties to each other in the purchase of the stock of the Ohio Valley Gas Company. As to this the allegation is that there was a partnership agreement to unite their credit, efforts and influence and to divide equally the profits of management and sale. Upon this allegation the whole case rests. In considering the plain-

tiff's testimony in relation to this subject it is important to understand the condition of the company and the relation of the parties to it. The capital of the Ohio Valley Gas Company was $100,000, divided into 20,000 shares, 19,000 of which were owned by the Guarantee Trust Company of Philadelphia. The gas company was not prosperous. It had many miles of pipe and a market for all the gas it could furnish, but the supply of gas was insufficient and its increase by the purchase of new territory and the drilling of more wells involved an expenditure that the trust company was unwilling to make. The plaintiff was president of the gas company and for several years had been in charge of its affairs. He had six shares of stock. The defendant was not a stockholder, but a creditor, of the company. The total indebtedness of the company was $56,000, and of this there was due the defendant $23,000 for drilling wells, for which he had received the company's notes, and had had them discounted by a Pittsburg bank. The bank was pressing him for payment, and declined to assent to a renewal of the notes. Under these circumstances the parties met in Pittsburg in January, 1896, and discussed the payment of the notes and the condition of the company. The plaintiff told the defendant that the company could not then pay the notes and that he saw no future for the company unless more money could be put into the business, and that the trust company was unwilling to do this. The defendant then suggested that they together purchase the stock, and the plaintiff declined to consider the proposition until it was made certain that arrangements could be made to get enough money to put the company on a paying basis. What then took place is best shown by the plaintiff's testimony : " Mr. Smith said to me after we had been talking along this line : 'What is the matter with you and I buying the stock of the Ohio Valley Gas Company?' and I replied to him that it was not much good for him and I to buy the stock of the Ohio Valley Gas Company unless we had money to put it on a paying basis, to operate it properly. He said he believed he could get the money to do that from Mellon's bank, and asked me if he could do that whether I would be willing to go in and take a half interest in the company, and him and I run it together; and I replied to him that it would be time enough for him and I to talk about the interest him and I should take after he found

he could make these financial arrangements, and after we found we could buy the stock from the Philadelphia people." The same day the defendant arranged to borrow enough money to buy the stock, and went to Philadelphia to negotiate for it, taking the plaintiff with him. The plaintiff advised the trust company to sell its stock for $75,000 unless it was willing to advance more money, and it sold to the defendant for that price. It is clear that at this time no agreement of partnership or joint interest of any kind had been entered into. The defendant purchased the stock with his own money or on his own credit, and the plaintiff had distinctly declined to consider any proposition until it was ascertained both that the stock could be purchased and that sufficient money could be raised to enlarge the plant.

The second conversation between the parties took place in a sleeping car on their way home from Philadelphia. The plaintiff's testimony concerning it is as follows: "Mr. Smith said to me : 'Now we have arranged to buy the stock of the Philadelphia people I want you to stay with me and the company and we will operate the company or put it in shape to sell it, and if we can make money by operating the company, or by getting it in shape to sell it, and do sell it, I want you to have a half interest in it.' And I said to Mr. Smith : 'My experience in the gas business has been such that I know we are going to have a large contract on our hands ; I know there is going to be trouble getting money to put that thing where it should be.' He said there would be no trouble about that, then, as far as he was concerned he would agree to look after the financial part. . . . . It was further agreed between us that since he had arranged to put this stock as collateral with the Mellon's for the purchase money, that since he had arranged to borrow the money himself and not for him and I, and since he was going to take the responsibility of financing, it was only right and proper that the title should remain with him; that was perfectly satisfactory to me, and just as we were going to bed that night I said to Mr. Smith : 'If you ever forget this agreement after all I have done for you, you will be the most ungrateful man that ever wore shoe leather.' Mr. Smith said he would never forget me."

If any agreement was made it is to be found in the second

conversation held in February, 1896. It was the last conversation between the parties on the subject. The defendant became president of the Ohio Valley Gas Company and developed it in connection with the Midway Gas Company, which he already owned and which had an oversupply of gas and but few customers. The plaintiff became an employee of the company, and was subsequently an employee of other companies organized by the defendant, but he did not at any time speak of an agreement, nor assert, nor suggest a right to participate in the management of the company, nor to receive a part of its income or of the proceeds of its sale, until April, 1900, when he asked for an account. What agreement if any is established by this conversation, or can be implied from it? These were business men discussing a business proposition, which had its origin in a proposal made by the defendant a few days before at Pittsburg that they together purchase the stock of the Ohio Valley Gas Company. This proposal the plaintiff had declined to consider, and the defendant had arranged to borrow the money by mortgaging his property and to purchase the stock on his own account. The plaintiff had no interest in the purchase and no right in connection with it. In the negotiation he had represented the seller, the trust company, and had advised a sale to the defendant. The defendant having obtained control of nearly all the stock wished the plaintiff to stay with him and the company, and to have a half interest in the business. The plaintiff hesitated and objected, as he had before done, because of the difficulty in raising money to develop the property, and was told by the defendant that he would attend to the finances. This was in substance a renewal of the first proposition, which had been declined. It was not an offer to give the plaintiff a half interest. It is utterly unreasonable to suppose that the defendant was offering to give for nothing a half interest in property for which he was to pay $75,000 in cash, and as an inducement for the acceptance of the gift, agreeing to assume the labor, responsibility and risk of its financial management. The expression, " I want you to have a half interest, " following a suggestion that they together purchase the property, is not a proposal to give him a half interest, but an offer to admit him to the purchase. The most that can be made of this conversation in the nature of an agreement is that the plaintiff

was asked to join in the venture, and that the gratuitous offer was left open for his acceptance. His final answer in that conversation was the last words ever spoken by him on the subject: "If you ever forget this agreement. . . . you will be the most ungrateful man " etc., was not the language of one who had made a valid agreement and had a right which he could assert, . but of one who expected a favor. If this was the offer, it was never acted on by the plaintiff. He did not accept it by agreement to purchase and he did nothing which indicated or could be construed as an acceptance. He never contributed a dollar, nor pledged his credit, nor assumed a liability of any nature to the defendant nor in connection with the business, and it was more than four years from the time of this conversation that he first made a demand for an account and settlement.

These are the facts connected with the making of the agreement as they appear in the plaintiff's testimony. They do not in our judgment sustain his bill. In connection with other facts to which it is needless to refer they might warrant the conclusion that an option was given him to join in the venture or that there was a mutual understanding that he should be liberally rewarded if the enterprise was successful. They do not however show that he had an interest, and without this his suit fails.

This conclusion makes it unnecessary to consider the question of corrroboration. If the plaintiff failed to establish the main point, there was nothing to corroborate. But on this subject we may say that but few of the facts relied on for corroboration were established by independent and uncontradicted testimony ; and that the few that were so established are quite as consistent with the view that the plaintiff expected a gratuity and the defendant intended to reward him, as that he had any right in the matter ; and that their effect as evidence in his favor is seriously impaired, if not wholly destroyed by his deliberate declaration under oath in another proceeding in court in 1898 that he had no interest real or nominal in the Ohio Valley Gas Company and that he did not participate in its profits and never had participated in them.

The decree of February 20, 1901, appointing a receiver and ordering an accounting is reversed and set aside, and it is now ordered that the bill be dismissed at the cost of the appellee.